UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------ x

UNITED STATES OF AMERICA                :

    - against -                         :

                                        :   18 Cr. 101 (PAC)

CASEY MICHAEL ANTONE,                   :

         Defendant.                     :

------------------------------------------------------------ x

DEFENDANT'S SENTENCING MEMORANDUM

Preliminary Statement

This Sentencing Memorandum is respectfully submitted in advance of Mr. Antone's sentencing, currently scheduled for October 25, 2018. For the reasons set forth below, Mr. Antone respectfully requests that the Court sentence him to a term of imprisonment lower than the Guideline recommendation of 30 months, to a more lenient non-Guideline sentence. Additionally, Mr. Antone requests that the Court recommend to the Bureau of Prisons that he be placed in a low or minimum security prison close to the city of Albuquerque, New Mexico, where he intends to make his home after he is released. Specifically, Mr. Antone asks that the Court recommend FCI La Tuna in Anthony, Texas. Mr. Antone respectfully asks the Court to recommend that he be permitted to serve his post-release supervision in Albuquerque, New Mexico. Finally, Mr. Antone requests that he receive jailtime credit for the 14 days that he spent incarcerated in the Netherlands, before being deported to the United States.

1

<u>Facts Relating to the Personal Background of Casey Michael Antone</u>

During the interview with United States Probation Officer Simone Belgrave, Mr. Antone stated that he was born in Detroit, Michigan and raised in a middle class household in a good neighborhood, of which he has fond memories. PSR ¶¶ 84-87. He also informed USPO Belgrave that he was sent to the Elan School in Maine, where he graduated in 1991. The PSR indicates that the Elan School was a "therapeutic school for troubled youth that closed in 2011." PSR ¶ 100.

However, upon further research, the undersigned discovered that the Elan School was notorious for "attack therapy" tactics that involved beatings, starvation, humiliation, and slave labor. As a private school it was virtually unregulated with no government oversight. "The Last Stop," a documentary about the school and its survivors that was released in 2017, details a "Lord of the Flies" environment that dealt with child behavioral problems through an extreme mix of military, public humiliation, heavy surveillance, thought reform, and harrowing trauma.[1]

One of the tactics used was a "boxing ring" where one child who violated a rule or rules would be put up against three or more others who were fighting for "good." In 2016, the Associated Press reported that Maine police were looking into a claim that one of these boxing matches preceded a student's death from a brain injury three decades ago. The 15 year old victim, Phil Williams, Jr., according to former students who witnessed the event, was pummeled by teenagers wearing boxing gloves, as punishment because staff members thought he was faking a headache. One witness remembers Williams going into convulsions. He died the next day. *See* Providence Journal, "Police Looking into 33-year-old Death at Elan School, March 15, 2016, attached as Exhibit A.

---

[1] *See* trailer for "The Last Stop," https://www.imdb.com/title/tt6508926/videoplayer/vi2894444825?ref_=tt_ov_vi.

Former students started a thread on www.reddit.com entitled "I am a survivor of the Elan School" and detailed such horrors as children being thrown into an isolation room where they had to stay for months at a time, sleeping on a dirty mattress on the floor; a ritual called "General Meeting" where 60 or more boys and girls screamed at one child who stood behind a broomstick; and having all phone calls to parents monitored while children were told not to tell parents what they were experiencing or they would be punished.

In 2002, the New York Times published an article called "Skeletons in the Classroom" about Elan, attached herein as Exhibit B. "At Elan, smiling without permission can lead to a session of cleaning urinals with a toothbrush that can last for hours…a New Jersey professor who sent her daughter to Elan for three years in 1997 [saw] her berated as a 'slut' by a school official during a parental visit…." "Tatiana Karam, 21, who attended Elan from 1996 to 1998, said she witnessed three or four boxing sessions, or 'rings' as they are known, and said she saw a student placed in a corner in plastic restraints for so long that she became malnourished and was sent to the hospital." The reporter who wrote the article was turned away from the school when he went to visit and ask for comments.

Mr. Antone's criminal history since graduating from the brutal Elan School, starting in 1992 at age 19 with theft of services (PSR ¶ 77) now makes much more sense given the intense mental and physical abuse he must have suffered at that horrific institution. The PSR's sentencing recommendation of 30 months is based in large part on Mr. Antone's criminal background since the age of 20, citing crimes and/or arrests in ten states.[2]

While I am not a psychologist, based upon my experience in 34 years of representing persons in the criminal justice system, I have repeatedly seen defendants compartmentalize and

---

[2] The PSR also cites Mr. Antone's "lack of remorse" in the email he wrote to American Express after being deported from the Netherlands. Remorse would be an odd thing to "feel" for a corporation as opposed to a person, for anyone.

bury their human connections and feelings because it was necessary in order to endure and survive the serious physical and mental trauma they underwent as children. Given the context of what Mr. Antone must have experienced at the Elan School, I am not surprised that his adjustment back into society suffered greatly after enduring four years there.

It is also no longer surprising to me that – given Mr. Antone's assertion of growing up in an intact family and living in a good neighborhood as a child – he has not had contact with his family in over 20 years. PSR ¶ 88. Any parent who sent a child to the Elan School for a period of years should expect that the parent-child bond would be severely ruptured. It is no wonder he put thousands of miles between himself and his family by remaining in Europe for over 15 years. Mr. Antone has chosen not to reach out to his mother or sister about sending a letter to the Court to ask for leniency on his behalf, which is no longer surprising.

In short, Mr. Antone was damaged at a tender age by serious physical and mental abuse at the hands of adults, which he has recoiled from talking about. Neither his letter to this Court in support of his sentencing requests nor his conversation with USPO Belgrade in preparation for the PSR dealt with what he experienced at the Elan School. This is in dramatic contrast to many defendants who are seeking sympathy for all that they suffered growing up. Mr. Antone revealed in the PSR that, at the time of his arrest, he was consuming alcohol to the point of intoxication on a daily basis. PSR ¶ 98. It may be too late for treatment for the emotional issues he suffered back in the late 1980's through his graduation in 1991, but certainly it is not too late for alcohol treatment, to help him cope without self-medicating himself to the point of forgetfulness.

The Offense Conduct

The offense conduct is non-violent, and indeed solitary. Mr. Antone admits that he utilized an algorithm that credit card companies and American Express in particular used to

create the numbers that are issued and stamped on credit cards. The particular type of credit card that Mr. Antone targeted was the corporate expense account. Through experimentation with the last four to five digits of the account number, Mr. Antone was able to hit on actual corporate American Express cards and purchase a variety of travel items such as Amtrak tickets, airline tickets, and hotel accommodations. He would then sell these to individuals, through the internet, at a discounted rate and keep the money they paid to his PayPal account. PSR ¶ 55.

Because of the wording of the statute, which includes the obtaining of credit card numbers, Mr. Antone committed access device fraud, but in an uncommon way that did not victimize ordinary consumers. He did not have a tangible "access device." Those tangible devices are used to steal credit card numbers from ordinary consumers, who insert their cards into devices at banks and retail stores in order to obtain money and pay for goods. This he refrained from doing.

Most importantly, all the transactions were via the internet, and none were coercive. Mr. Antone never attempted to steal from individuals, but only from the corporate credit cards. He didn't attempt to take any person's retirement money or savings. He didn't physically or forcibly steal a wallet or a purse. He sat by himself in front of a computer, creating numbers in his head until he hit upon a real corporate credit card number. The injury was to a corporate entity. The individuals who encountered him over the internet received discounted train and plane tickets that saved them money.

Mr. Antone's preference for stealing from a corporate entity does not justify his crime in any way. However, it does speak to his choice and his sense of moral values that he refrained from preying upon the weak and the needy. He picked on a corporate giant rather than a vulnerable, common person. He has agreed to make restitution in the amount of $207,006.34.

Request for Non-Guidelines Sentence Based on
<u>Unfairness of Loss Enhancement Guidelines</u>

As Judge Garaufis stated in *United States v. Johnson*, 2018 WL 1997975 (EDNY April 27, 2018), with regard to loss enhancements for white collar fraud, "The Guidelines do not ask the court to consider the duration of the criminal activity, Johnson's *mens rea*, the character of the loss, or any other factors that might allow the court to impose a sentence based on Johnson's worth. No, the threefold increase in Johnson's offense level does not come as a result of any of these significantly more important considerations. As far as this court can tell, the Sentencing Commission's loss-enhancement numbers do not result from any reasoned determination of how the punishment can best fit the crime, nor any approximation of the moral seriousness of the crime." In *Johnson*, Judge Garaufuis, faced with a Sentencing Guidelines calculation of 87-108 months (based on a 16-level enhancement for a loss of $1.5 to $3.5 million), sentenced the defendant to 24 months in jail with a $300,000.00 fine.

The Second Circuit has also condemned the methodology of the Sentencing Guidelines when it comes to enhancing a fraud sentence strictly by an amount of loss calculation:

> This approach, unknown to other sentencing systems, was one the Commission was entitled to take, but its unusualness is a circumstance that a sentencing court is entitled to consider. *See Kimbrough v. United States*, 552 U.S. 85, 101, 128 S.Ct. 558, 169 L.Ed.2d 481 (2007) (sentencing judge may make a non-Guidelines sentence if the judge disagrees with a Commission's policy determination); *United States v. Cavera*, 550 F.3d 180, 192 (2d Cir. 2008) (in banc) (same). Where the Commission has assigned a rather low base offense level to a crime and then increased it significantly by a loss enhancement, that combination of circumstances entitles a sentencing judge to consider a non-Guidelines sentence.

*United States v. Algahaim*, 842 F.3d 796, 800 (2d Cir. 2016).

In Mr. Antone's case, the loss of more than $550,000.00 but less than $1.5 million results in a 14-level enhancement over a base offense level of 6. Additionally, Mr. Antone has already agreed to restitution in the amount of $207,006.34 to make American Express whole. The

repayment of this money is a significant hurdle that Mr. Antone will face in the coming years, keeping his offense and its consequences before his eyes for a great number of years.

Given the current realization that the Guidelines, in basing a jail sentence almost exclusively on loss amount, is "fundamentally flawed" and "distorted," *United States v. Corsey*, 723 F.3d 366, 380 (2d Cir. 2013), Mr. Antone begs the Court to impose a much lesser, non-guidelines sentence.

Request for a Non-Guideline Sentence Based on<br>Factors to be Considered in Imposing Sentence

Pursuant to 18 U.S.C. § 3553(a), the Court shall impose a sentence sufficient, but not greater than necessary, to comply with the purposes of the statute with regard to the need for the sentence imposed. Mr. Antone respectfully submits that a sentence below the Guidelines range of 30-37 months, and below Probation's recommendation of 30 months, is appropriate in this case.

The nature and characteristics of the offense have been outlined above, as has the most significant portion of the history of the defendant. Attached to this sentencing memorandum are two letters from friends and one family member, who regard Mr. Antone as an intelligent and generous individual. Mr. Antone is indeed an educated and intelligent man, and had he not endured severe trauma at the Elan School it is likely that he would never have taken the criminal role that he has in his life up to now. However, even despite his trauma and turning to crime, he never physically attacked anyone, and he never preyed on a vulnerable population – he never preyed on people at all.

This non-violent crime that does not target a vulnerable victim warrants a much-reduced jail sentence. The type of sentence that would reflect the seriousness of the offense and promote respect for the law, as well as provide just punishment for the offense, is one that would

emphasize the payment of the large amount of restitution at issue here. What American Express, the victim, really wants is its money back. Incarcerating Mr. Antone does not assist American Express in being made whole. Rather, having Mr. Antone attempt to use his intelligence to become a productive member of society and earn a salary would benefit American Express much more.

Mr. Antone has not been in jail since 1998, when he completed an 18-month sentence in the Eastern District of Louisianna. PSR ¶ 72. He was about 25 years old when he completed that sentence. His current incarceration reflects a change in attitude and maturity, because he has used his time at MCC to assist other inmates and to better himself. He has completed two certificate programs (Lead by Example and Healthy Living), and until he was moved to Westchester County Correctional Facility, was enrolled in the "Focus Forward" program. PSR ¶ 105. He was actively engaged at MCC in teaching and tutoring other inmates so that they could earn their GED's – a program that had been abandoned for many years because there were no willing and qualified individuals available to teach. Mr. Antone has written the Court a letter, also attached, which clearly shows his maturity and understanding of the wrong roads that he took.

<u>Credit for the 14 Days Spent in Prison in the Netherlands</u>

Mr. Antone was arrested by Dutch officials on April 11, 2016, and remained incarcerated until his deportation two weeks later on April 25, 2016. This was mentioned in his email to American Express after his deportation. PSR ¶ 14. His detention was based on the offense conduct outlined in the indictment, which charges a Conspiracy to Commit Access Device Fraud from January 2015 through February 2018. From January 2015 through April 2016 he was in the Netherlands.

Pursuant to 18 U.S.C. § 3585(b), "A defendant shall be given credit toward the service of a term of imprisonment for any time he has spent in official detention prior to the date the sentence commences ... (1) as a result of the offense for which the sentence was imposed...." The statute does not limit its application to detention time within the territorial United States. Therefore, Mr. Antone respectfully requests that the Court order the Bureau of Prisons to credit Mr. Antone with an additional 14 days spent in custody in the Netherlands in April 2016.

## Conclusion

For all of the above reasons, Mr. Antone respectfully requests that he be given a sentence under the Guidelines range that more appropriately reflects the offense conduct. Mr. Antone further requests that the Court recommend that he be placed in a federal facility close to Albuquerque, New Mexico, where he intends to make his home after he is released from prison – specifically, that he serve his sentence at FCI La Tuna in Anthony, Texas. Mr. Antone further requests that he be permitted to serve his post release supervision in Albuquerque, New Mexico, and asks the Court to make that recommendation as well.

Respectfully submitted,

Camille M. Abate, Esq.
Attorney for Casey Michael Antone